NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In the matter of | : | Case No. 05-38352/JHW |
| Gwen Curriden | : | |
| Debtor | : | |
| _____ | : | |
| Steven R. Neuner, the Chapter 7 | : | Adversary No. 06-1761 |
| Trustee for Gwen Curriden, and | | |
| Gwen Curriden, individually | : | **OPINION** |
| Plaintiffs | : | |
| v. | | |
| | : | |
| Innovative Mortgage Solutions LLC; | | |
| Trinity Insurance, Abstract & Title | : | |
| Agency, LLC; Troy "Alim" Wallace; | | |
| Bruce Hurdle; Jeffrey Adams, and | : | |
| Danette Thomas | | |
| | : | |
| Defendants | | |
| _____ | : | |
| In the matter of | | |
| | : | Case No. 06-10658/JHW |
| Vincent T. Richardson and | | |
| Cynthia L. Richardson | : | |
| Debtors | : | |
| _____ | : | |
| Steven R. Neuner, the Chapter 7 | : | Adversary No. 06-1762 |
| Trustee for Gwen Curriden, and | | |
| Gwen Curriden, individually | : | |
| Plaintiffs | : | |
| v. | | |
| | : | |
| Vincent T. Richardson and | | |
| Cynthia L. Richardson | : | |
| Defendants | : | |
| _____ | | |

FILED

JAMES J. WALDRON, CLERK

September 6, 2007

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: Theresa O'Brien, Judicial
Assistant to Chief Judge Wizmur

APPEARANCES:          Steven R. Neuner, Esq.
                      Neuner and Ventura, LLP
                      Willow Ridge Executive Office Park
                      750 Route 73 South, Suite 210
                      Marlton, New Jersey  08053
                      Counsel for the Chapter 7 Trustee

                      Mark A. Rinaldi, Esq.
                      Willow Ridge Executive Office Park
                      750 Route 73 South, Suite 210
                      Marlton, New Jersey  08053
                      Counsel for Gwen Curriden

                      Michael A. Katz, Esq.
                      Dempster & Haddix
                      Centerpointe at East Gate
                      161 Gaither Drive, Suite 201
                      Mt. Laurel, New Jersey  08054-1740
                      Counsel for Innovative Mortgage Solutions

                      Jason N. Sunkett, Esq.
                      Walter Lacey, Esq.
                      Sunkett & Lacey, LLC
                      Laurelwood Professional Blvd.
                      1916 Route 70 East, Suite 6
                      Cherry Hill, New Jersey  08003
                      Counsel for Trinity Abstract and Danette Thomas

                      Keith Owen Campbell, Esq.
                      402 Park Boulevard
                      Cherry Hill, New Jersey  08002
                      Counsel for Bruce Hurdle

                      Stephanie Ritigstein, Esq.
                      Jenkins & Clayman
                      412 White Horse Pike
                      Audubon, New Jersey  08106
                      Counsel for the Richardsons

In these two administratively consolidated adversary proceedings, the Chapter 7 trustee and the debtor, Gwen Curriden, assert that the defendants conspired to defraud the debtor of her proper share of the proceeds from the prepetition sale of her home.  The plaintiffs seek to avoid the various alleged fraudulent transfers made from the sale proceeds and to recover punitive and other statutory damages for the benefit of the bankruptcy estate.  As to the Richardsons, the trustee also seeks a determination that the debt due to the Curriden estate is nondischargeable. The various defendants dispute the existence of a conspiracy and maintain that there was nothing fraudulent in their involvement in the sale and closing on the debtor's home.

## PROCEDURAL HISTORY

This matter involves two separate bankruptcy petitions:  one filed by the plaintiff, Gwen Curriden, and one filed by the defendants Vincent and Cynthia Richardson.  Gwen Curriden filed a voluntary petition under Chapter 7 of the Bankruptcy Code on September 2, 2005.  She listed no real property and scheduled $86,025.33 in unsecured debt.  In her Statement of Financial Affairs, the debtor disclosed that she sold her previous residence at 326 East High Street, Clayton, New Jersey to Vincent Richardson on December 31, 2004, and received $5,000.00 back from the sale proceeds.

Steven R. Neuner was appointed the Chapter 7 trustee on September 7, 2005.  At the debtor's meeting of creditors,[1] the trustee questioned the circumstances surrounding the debtor's

---

[1]        11 U.S.C. § 341(a).

prepetition sale of her home to Vincent Richardson, and continued his investigation following his

examination of the debtor.

In the interim, on February 1, 2006, Vincent T. and Cynthia L. Richardson filed their own

petition for relief under Chapter 13 of the Bankruptcy Code.  The Richardsons' Statement of

Financial Affairs disclosed that they sold the Clayton property to a third party in November 2005,

and that they received $1,300.00 in net proceeds.  The Chapter 7 trustee for the Curriden

bankruptcy estate filed a proof of claim in the Richardsons' case, and objected to the

Richardsons' proposed Chapter 13 plan.[2]

On April 28, 2006, the Chapter 7 trustee filed adversary complaints in both the Curriden

and the Richardson cases.  In the Curriden case, the trustee filed a ten-count complaint,

Adversary Case No. 06-1761, against defendants Innovative Mortgage Solutions, LLC; Trinity

Insurance, Abstract & Title Company, LLC; Troy "Alim" Wallace; Bruce Hurdle; Jeffrey Adams

and Danette Thomas.  The complaint alleges common law fraud, conspiracy, RESPA and New

Jersey Consumer Fraud Act violations, and seeks to avoid fraudulent transfers under 11 U.S.C. §

548 and applicable state law.  The Richardson complaint, Adversary Case No. 06-1762, is a

three-count complaint alleging violations of RESPA and the New Jersey Consumer Fraud Act

against Vincent and Cynthia Richardson.  It also seeks a determination of nondischargeability

under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 1328(a)(2).  The Richardsons' answer includes

---

[2]        The trustee filed an unsecured proof of claim in the amount of $29,512.74 on
February 9, 2006.  On April 26, 2006, the trustee amended his claim to $38,102.74, plus trebled
damages for a total claim of $114,308.22.

cross claims for damages against and indemnification from the other defendants.  The two

adversary proceedings were procedurally consolidated on June 7, 2006.


The trial was held on February 21, February 22 and March 1, 2007.  Testimony was

presented by Gwen Curriden, Cynthia Richardson, William Rogers (the owner of Innovative

Mortgage Solutions) and Danette Thomas (the closing agent).  By consent of the parties, the

transcript of Bruce Hurdle's deposition was also entered into evidence.


## FACTS


Both adversary complaints arise from the events surrounding Gwen Curriden's sale of her

home to Vincent Richardson on New Year's Eve, December 31, 2004.  The plaintiffs paint a

picture of the debtor as scared, confused and desperately trying to sell her home under the threat

of foreclosure.  She relied upon the assistance of a co-worker, defendant Jeffrey Adams, and his

connections to help her sell her home.  Although the settlement sheet indicated that she would

receive over $41,000 from the sale, the debtor signed over all but $5,000 of the proceeds to

various parties connected to the sale process for finder's fees and other costs.  Vincent

Richardson, the buyer, received over $26,000.  The plaintiffs allege that the various defendants

conspired to defraud the debtor.  The defendants contend that they were merely trying to help the

distressed debtor to sell her home, and that the finder's fees were reasonable and disclosed.  They

claim that there was no conspiracy and no fraudulent transfers.

The story begins several months prior to the sale of Ms. Curriden's home.  Ms. Curriden credibly testified that during 2004, she was struggling both financially and emotionally.  She was separated from her husband, who had recently stopped making child support payments.  She was employed at Sam's Club, but she was not able to make ends meet and had fallen behind on most of her bills.  Sometime in August 2004, she was served with a Complaint in Foreclosure filed by Wells Fargo Bank.  By the fall of 2004, she was about a year behind on her home mortgage.  She explains that she was suffering from depression and did not know what to do.

As her financial problems mounted, Ms. Curriden confided in a co-worker at Sam's Club, Jeffrey Adams, regarding the potential foreclosure on her home.  Adams suggested that he may be able to help because he "had an interest in"[3] or "was connected somehow"[4] to a mortgage broker.  Curriden trusted Adams, and accepted his help.

Sometime in October or November 2004, Adams brought defendant Bruce Hurdle and Harry Green to see Curriden's house.  Adams and Hurdle mentioned to Curriden that they were somehow connected to Innovative Mortgage, a mortgage broker, but the connection was unclear.  Curriden "just assumed that [Green] was connected with Bruce Hurdle and [she] understood them [both] to be connected to Innovative Mortgages."[5]  She stated that she "trusted Jeffrey and

---

[3]      T45-7 (2/21/07).

[4]      T46-16 (2/21/07).

[5]      T49-10 to 11 (2/21/07).

Bruce and they offered to help and [she] didn't know what to do or how to do it."[6]

Hurdle told Curriden that "[h]e thought he could sell it [the house]."[7]  Hurdle was not a

licensed realtor or mortgage broker, but had been a teacher who was just starting his involvement

with the mortgage solicitation business.  Hurdle's brother, Brooke Hurdle, managed the

operations of Innovative Mortgage in Audubon, New Jersey.  In November and December 2004,

Bruce Hurdle spent some of his time with defendant Troy "Alim" Wallace at Wallace's Cherry

Hill business location.  Wallace worked for Innovative Mortgage as a mortgage solicitor at the

time.  Green was Wallace's father-in-law.  Curriden testified that Green asked her to sign a paper

stating that she would agree to receive only $5,000 from the sale of the house, but she declined to

do so.  At the time, she expected to realize more from the sale, since she had lived in the house

for the last twelve years and she assumed that there would be more equity in the property.

Nevertheless, Curriden agreed to cooperate with Adams and Hurdle to try to sell her house.

Thereafter, in late November or early December 2004, Hurdle brought Vincent and

Cynthia Richardson to view Curriden's home.  Cynthia Richardson was a close family friend of

Wallace, whom she knew since she was a child.  Wallace introduced Cynthia to the transaction,

proposing to her that she purchase the property as a "bridge deal", meaning that she and/or her

husband would buy the property, would obtain cash at the settlement table (Wallace promised

Cynthia that she would receive $40,000), and would then be able to resell the property for a

---

[6]      T159-3 to 4 (2/21/07).

[7]      T47-23 to 24 (2/21/07).

profit.  Curriden, who was meeting the Richardsons for the first time when they came to see her

house, assumed that the Richardsons contemplated buying the house to live there.  Curriden and

the Richardsons did not discuss the sale price for the house.  Following the visit, the Richardsons

agreed with Wallace to buy the house for $125,000, believing that they would not be required to

pay any costs involved in the transaction, that they would receive $40,000 at the closing, and that

they would receive title to and possession of the property.

On December 18, 2004, Cynthia Richardson, on behalf of her husband, executed an

Application Disclosure with Innovative Mortgage Solutions to obtain a loan to purchase

Curriden's home.[8]  Wallace handled the mortgage application process for the Richardsons.

Bruce Hurdle, who was not officially employed at Innovative until June 2005, handled much of

the paperwork in arranging the details of the settlement with Trinity Title from Wallace's office.

Curriden testified that she was left in the dark about what was happening with the sale of

her home until sometime during the last week of December 2004, when she received a call from

Hurdle informing her that there would be a closing on New Year's Eve, December 31, 2004.

Because she did not have transportation, Hurdle offered to pick her up after work.  He picked her

up sometime around 6:30pm and they arrived at the Trinity Title office in Cherry Hill about an

hour later.  Her daughter Catherine and her daughter's fiancé met her there, but they did not

participate in any way in the settlement, and attended only to drive Curriden home.

---

[8]        Exh. P-1.

Prior to the closing, Curriden never had any discussions with anyone regarding the sale price for the property or the net proceeds she would receive. She learned for the first time at the closing that the home would be sold for $125,000. The sales contract indicated that she had agreed to pay up to 6% of the buyers' closing costs. She testified that that provision was never explained to her and she did not know what it meant.

At the closing, Curriden was introduced to Wallace. Besides the Curridens, in attendance at the closing were the Richardsons, Adams, Hurdle and Danette Thomas, the closing agent who is also a part owner of Trinity Title. It appeared to Curriden that the people at the table were generally acquainted with each other. Although the Contract of Sale for the property was dated December 21, 2004, Curriden recalls that she was first presented with the document at the settlement table on December 31, and she had not signed anything prior to that time.

Curriden testified convincingly that she was tired, scared and confused during the entire closing process, and that she did not understand what she was signing. She explained, "I was handed several papers. I signed what they told me to sign as they handed it to me [and signed] where they told me to sign it."[9] When she was presented with the HUD-1 Settlement Statement, Curriden claims that she inquired about whether or not she needed legal counsel. She contends that the closing agent, Danette Thomas, informed her that she did not need a lawyer and that it

---

[9]    T126-1 to 2 (2/21/07).

-9-

would "complicate things."[10]  Ms. Thomas emphatically denied that she made that statement.[11]

The degree to which each document signed by Curriden was explained to her is also disputed,[12]

but I accept Curriden's testimony that she did not understand the transaction, and simply signed

the documents as they were presented to her.

The settlement sheet, which was prepared by Trinity Title prior to the closing, reflected

that the purchase price of the property was $125,000.  The mortgage payoff was noted as

$72,768.0, with an additional $1,500 escrow pending payoff release.  The settlement costs of

$7,099.64, which included all of the Innovative Mortgage charges for obtaining the Richardsons'

mortgage loan and all Trinity Title expenses, were charged to Curriden as a "Seller

Contribution".[13]  After deducting the mortgage payoff and all settlement costs, the "Cash to

Seller" was noted as $41,602.74.

Before the final disbursement checks were presented at the closing, without explanation

to the debtor, the Richardsons, Wallace, Adams, Hurdle and Thomas all left the room, leaving

only the debtor, her daughter and her daughter's fiancé at the settlement table.  In Thomas' office

---

[10]     T67-25 (2/21/07); T127-9 (2/21/07).

[11]     I need not resolve the factual dispute here because it is not determinative of the
conclusions reached.

[12]     Curriden testified that the documents she signed were never explained to her,
whereas Thomas testified that she always explained each document presented at settlement.

[13]     Curriden, as the seller, was charged with 100% of the buyers' closing costs
notwithstanding the fact that the Agreement of Sale specified that the seller would be responsible
for only "up to 6% of the buyer's closing costs".  Exh. P-4, ¶ 24.

-10-

across the hall from the settlement, Cynthia Richardson expressed to Wallace that she was upset

and angry at the fact that she and her husband would be receiving less than the $40,000 that she

had been promised from the transaction.  She was also upset about the fact that she and her

husband would not be taking possession of the property immediately, but that, according to

Adams and Hurdle, the debtor needed to stay in the property for another month.  Apparently,

before the closing actually took place, Wallace, Adams and Hurdle had agreed that Adams and

Hurdle would each receive a $5,000 "finder's fee".  Wallace determined that the $10,000 in fees

would be deducted from the $40,000 payment promised to the Richardsons.  After heated debate

among the Richardsons, Wallace, Adams and Hurdle in Thomas' office, the defendants agreed

that the debtor could continue to occupy the property during January 2005, that she would pay

one month's rent in the amount of $1,160, which approximated the cost of one month's mortgage

payment to be paid by the Richardsons, that the rental payment would be placed in escrow at

Trinity Title and that the rental payment would be paid from the finder's fees otherwise payable

to Adams and Hurdle.  Wallace gave Thomas instructions to distribute the "cash to seller" as

follows:

| | |
|---|---|
| Vincent Richardson[14] - | $26,602.74 |
| Adams - | $4,420.00 |
| Hurdle - | $4,420.00 |
| Curriden - | $5,000.00 |

The debtor was not consulted about these arrangements.  Adams returned by himself to

---

[14]     Although Cynthia Richardson was most active in effecting the purchase of the
Curriden property, the property was actually purchased by Vincent Richardson, and was titled in
his name.

the settlement conference room with the disbursement checks, where he instructed Curriden to

sign the back of three of the four checks made out to her, which she did.  He also presented her

with her check for $5,000.  Curriden described her conduct this way:  "I didn't know there was

anything wrong with that.  I was just doing what they told me I needed to do."[15]  The three checks

signed by Curriden were turned over to Richardson, Adams and Hurdle.

About a month after the settlement, Curriden received a check from Trinity Title in the

amount of $1,160, which was the amount that had been escrowed for the January rental payment.

Cynthia Richardson was notified about the payment as well, and she contacted Curriden to

retrieve the money.  Richardson and Curriden met, and Curriden signed over the check to

Richardson.[16]  Richardson testified that she realized at their meeting that Curriden had no

understanding of the circumstances of the settlement.  After their meeting, the debtor vacated the

property.

## DISCUSSION

The plaintiffs contend that Wallace, through Innovative Mortgage, orchestrated a "get

rich quick" scheme following a lead from Jeffrey Adams and supported by Bruce Hurdle and the

Richardsons.  Gwen Curriden became their innocent and trusting victim.  Through the aid and

---

[15]     Exh. D-1, T19-14 to 15 (341 Mtg. 11/2/05).

[16]     Curriden also received another check from Trinity Title, in the amount of $1,500,
which had been escrowed at settlement, which she also signed over to Richardson.

assistance of the closing agent, Danette Thomas, representing Trinity Title, the conspirators were able to take advantage of Ms. Curriden and walk away with the majority of the proceeds from her home. The plaintiffs allege the existence of a civil conspiracy to defraud the debtor and contend that each of the defendants aided and abetted the actions taken to defraud her. The plaintiffs contend as well that the defendants violated RESPA and the New Jersey Consumer Fraud Act. They seek $44,776.41 in actual damages,[18] as well as punitive and statutory damages, and they ask that the debt owed by the Richardsons be found to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(4).

I will first determine the liability of defendants Adams, Wallace and Hurdle, and will then review the causes of action asserted against Innovative Mortgage, Trinity Title and Danette Thomas, and the Richardsons, respectively.

1.      Defendants Adams, Wallace and Hurdle.

Defendants Adams and Wallace defaulted on the complaint against them. Defendant Hurdle was permitted to file an answer out of time. He did not testify at trial, but his deposition was admitted into evidence with the consent of all parties.

Adams, Wallace and Hurdle are charged in the complaint with common law fraud,

---

[18]     Actual damages are calculated as follows:  net proceeds of $41,602.74 plus the overcharge of closing costs of $6,673.67 and the check endorsed over to Cynthia Richardson of $1,500 minus the $5,000 actually received.

conspiracy to defraud the debtor, violations of the New Jersey Consumer Fraud Act, and

violations of the Real Estate Settlement Procedures Act ("RESPA").  While these causes are

somewhat duplicative and overlapping, each cause of action will be reviewed.


      a.      <u>Common Law Fraud</u>.


"In order to establish a claim for common law fraud under New Jersey law, one must

show:  (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or

belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4)

reasonable reliance thereon by the other person; and (5) resulting damages."  <u>Perry v. Gold &</u>

<u>Laine, P.C.</u>, 371 F.Supp.2d 622, 626 (D.N.J. 2005) (citing to <u>Gennari v. Weichert Co. Realtors</u>,

148 N.J. 582, 610, 691 A.2d 350 (1997)).  <u>See</u> <u>also</u> <u>Bianchi v. Lazy Days R.V. Center, Inc.</u>, No.

06-1979, 2007 WL 1959268, *5 (D.N.J. July 5, 2007); <u>McCabe v. Ernst & Young, LLP</u>, No. Civ.

01-5747, 2006 WL 42371, *12 (D.N.J. Jan. 6, 2006), <u>aff'd</u>, --- F.3d ----, 2007 WL 2301916 (3d

Cir. 2007); <u>Banco Popular North America v. Gandi</u>, 184 N.J. 161, 172-73, 876 A.2d 253, 260

(2005); <u>Kaufman v. i-Stat Corp.</u>, 165 N.J. 94, 109, 754 A.2d 1188, 1195 (2000).  The

concealment by a knowing defendant of significant and material facts can constitute a material

misrepresentation.  <u>48 Horsehill, LLC v. Kenro Corp.</u>, 2006 WL 349739, *9 (N.J. App. Div. Feb.

22, 2006).


Here, the plaintiffs have clearly established that the defendants Adams and Hurdle

knowingly concealed material facts from Curriden, with the intent that Curriden rely on the

information, with resulting damages to Curriden.  The defendants Adams and Hurdle concealed

from the debtor the fact that the transaction they arranged would result in substantial and illegal

kickbacks to the Richardsons, to Adams and to Hurdle, and that but for $5,000, she would not

receive the equity in her home.

Hurdle testified at his deposition that as this transaction unfolded, Curriden offered to pay

him and Adams to help her.  He further testified that Curriden consistently confirmed that if she

received $5,000 from the transaction and had somewhere to go, "she was okay with that."[19]  He

claimed to have witnessed her actually sign a document stating that she only wanted $5,000 from

the closing, but he could not produce the document.  He claimed that "[s]he knew full well that

she would be paying for the services to get her out of the situation.  She knew that prior to [the

closing], and she fully understood that."[20]  He claimed to have discussed payment with her

"multiple times", both "face-to-face" and over the telephone, and that Curriden "was fully aware

of everything that was happening."[21]

Because Hurdle did not testify at trial, I cannot evaluate the credibility of his deposition

testimony based on such factors as demeanor or presentation on the witness stand.  Nevertheless,

the substance of Hurdle's testimony serves to discredit his testimony in its entirety.  As reflected

above, Hurdle received $4,420 from the settlement.  He had been promised $5,000, but he agreed

---

[19]     T73-17 to 18 (Dep. 2/5/07).

[20]     T78-17 to 20 (Dep. 2/5/07).

[21]     T80-1 to 3 (Dep. 2/5/07).

-15-

to share with Adams the cost of the debtor's January 2005 rent payment to the Richardsons.  At his deposition, he readily recalled that the Richardsons received over $26,000 from the settlement.  Shockingly, when Hurdle was first asked whether he received any money from the closing, he responded "I don't recall".[22]  Only after he was shown deposit slips of his bank accounts did he acknowledge his receipt of $4,420 from the settlement.

Hurdle's protestations notwithstanding, I find that the debtor did not knowingly agree to accept only $5,000 as her proceeds from the sale of her home, did not agree to pay Adams and Hurdle, did not know or understand that they or the Richardsons were receiving monies from the settlement, and did not understand anything about the transaction.  Further, I specifically find that Adams and Hurdle purposely concealed the relevant and material aspects of the transaction from her.

As well, the defendants Adams and Hurdle clearly intended that the debtor rely on them in connection with the transaction.  They dealt directly with Curriden, and encouraged her reliance and trust.  Effectively, they "held her hand" through the transaction, taking care of every detail for her, with the obvious intention of sustaining her reliance on them.

As to the element of Curriden's reasonable reliance on Adams and Hurdle, Hurdle correctly reflects that at the settlement, Curriden was presented with three separate checks.  She did not know that the checks were for Richardson, Adams and Hurdle, but she signed the back of

---

[22]     T100-200 (Dep. 2/5/07).

each check without making any inquiry.  Hurdle suggests that Curriden's failure to inquire should

defeat the element of reasonable reliance.  The concept of reasonable reliance does not

contemplate an objective test.  "Common law fraud requires a showing of actual reliance, but not

objectively reasonable reliance, since the perpetrator of a fraud may not urge that the victim

should have been 'more circumspect or astute.'" Union Ink Co. v. AT&T Corp., 352 N.J. Super.

617, 646, 801 A.2d 361, 379-80 (App. Div.), certif. denied, 174 N.J. 547, 810 A.2d 66 (2002)

(quoting Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 626 n.1, 432 A.2d 521, 524 n.1

(1981)).  Here, the debtor credibly represented her condition at settlement as depressed,

confused, tired and scared.  She signed whatever was placed in front of her.  She trusted her

friend Adams, and came to trust his friend Hurdle, who helped her through the pre-settlement

paperwork and accommodated her by driving her to the settlement.  She had no experience with

real estate settlements, having never attended one before.   There is no question that Curriden

actually relied on Adams and Hurdle in the course of this transaction, and that Hurdle, as a

perpetrator of the fraud, may not escape liability on the basis that Curriden should have been

"more circumspect or astute."  Id.


I conclude that as to Adams and Hurdle, the elements of common law fraud have been

established, and that they are each liable to the plaintiffs for damages incurred by Curriden in

connection with this transaction.


A different conclusion must be reached with regard to Wallace.  The New Jersey

Supreme Court has reflected that the elements of "[m]isrepresentation and reliance are the

hallmarks of any fraud claim, and a fraud cause of action fails without them."  Banco Popular

North America v. Gandi, 184 N.J. at 174, 876 A.2d at 261.  Although Wallace was the architect

of the scheme to defraud Curriden, and orchestrated the transaction, he had no direct contact with

Curriden.  It cannot be said that he misrepresented false facts to her, or concealed facts from her

which he knew to be significant and material to the transaction.  Nor can it be said that Curriden

relied on him in connection with the transaction in any way.  However, other causes of action,

particularly conspiracy charges against Wallace, have been properly pled to address the

malevolent actions of Wallace described herein.

           b.     Civil Conspiracy.

Under New Jersey law, a civil conspiracy is

> "a combination of two or more persons acting in concert to commit an unlawful
> act, or to commit a lawful act by unlawful means, the principal element of which
> is an agreement between the parties to inflict a wrong against or injury upon
> another, and an overt act that results in damage."  "It is enough [for liability] if
> you understand the general objectives of the scheme, accept them, and agree,
> either explicitly or implicitly, to do your part to further them."  Most importantly,
> the "gist of the claim is not the unlawful agreement, 'but the underlying wrong
> which, absent the conspiracy, would give a right of action.' "

Banco Popular North America v. Gandi, 184 N.J. 161, 177-78, 876 A.2d 253, 263 (2005)

(citations omitted).  See also State, Dept. of Treasury, Div. of Inv. ex rel. McCormac v. Qwest

Communications Intern., Inc., 387 N.J. Super. 469, 904 A.2d 775 (App. Div. 2006).  "While the

unlawful agreement need not be expressed, and while the participants need not know all the

details of the plan designed to achieve the objective or possess the same motives, they must share

the general conspiratorial objective.  To establish a conspiracy, the plaintiff must demonstrate

that there was one plan and that its essential scope and nature was known to each person who is

charged with responsibility for its consequences."  <u>Weil v. Express Container Corp.</u>, 360 N.J.

Super. 599, 614, 824 A.2d 174, 183 (App. Div. 2003).  <u>See also</u> <u>Bowen v. Parking Authority of</u>

<u>City of Camden</u>, No. 00-5765, 2003 WL 22145814, *37 (D.N.J. Sep. 18, 2003) ("the plaintiff

need only show circumstances from which a jury could infer that the alleged conspirators reached

an understanding about the objectives of the conspiracy.  The plaintiff does not need to prove the

'exact limits of the illegal plan or the identity of all participants.'").


      In the simplest terms, the elements of a conspiracy can be broken down to:

      (1) a combination of two or more persons;

      (2) a real agreement or confederation with a common design;

      (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by
      unlawful means; and

      (4) proof of special damages.

<u>Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.</u>, 331 F.3d 406, 414 (3d Cir.

2003).  <u>See</u> <u>also</u> <u>Delaney v. American Express Co.</u>, Civ. No. 06-5134, 2007 WL 1420766, *8

(D.N.J. May 11, 2007).


      There is no question that the plaintiffs have established that Adams, Hurdle and Wallace

acted in concert to inflict a wrong against and injury upon the debtor, which caused her damage.

The unlawful agreement was the scheme to pay illegal kickbacks to Adams, Hurdle and

-19-

Richardson, and to deprive the debtor of the equity in her home.  The essential scope and nature

of the conspiracy were known to Adams, Hurdle and Wallace.  They shared the conspiratorial

objective of defrauding the debtor.  Consequently, the debtor suffered the loss of $44,776.41 in

actual damages.[23]

On this record, I readily conclude that Adams, Hurdle and Wallace are liable to the

plaintiffs on conspiracy grounds for damages incurred in connection with the sale of her home.

c.      New Jersey Consumer Fraud Act.

The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., states in pertinent part:

The act, use or employment by any person of any unconscionable commercial
practice, deception, fraud, false pretense, false promise, misrepresentation, or the
knowing, concealment, suppression, or omission of any material fact with intent
that others rely upon such concealment, suppression or omission, in connection
with the sale or advertisement of any merchandise or real estate, or with the
subsequent performance of such person as aforesaid, whether or not any person
has in fact been misled, deceived or damaged thereby, is declared to be an
unlawful practice.

N.J.S.A. 56:8-2.  See Szczubelek v. Cendant Mortgage Corp., 215 F.R.D. 107, 124-25 (D.N.J.

2003).

"An offense arises under the Act from an affirmative act, an omission, or a violation of

administrative regulation."  Gennari v. Weichert Co. Realtors, 148 N.J. 582, 605, 691 A.2d 350,

---

[23]        See Note 18.

365 (1997).  While an affirmative misrepresentation imposes liability even in the absence of

knowledge of the falsity of the misrepresentation, or an intent to deceive, where an omission or

failure to disclose has occurred, the plaintiff must show that the defendant acted with knowledge.

Id.  "An intent to deceive is not a prerequisite to the imposition of liability."  Id.

        In this case, the same factual predicate that supports the conspiracy cause of action

against Adams, Hurdle and Wallace is available to support a violation of the New Jersey

Consumer Fraud Act.  The unlawful agreement and scheme between the three defendants to pay

illegal kickbacks to Adams, Hurdle and Richardson, and to deprive the debtor of the equity in her

home, constitute not only the affirmative acts of deception and fraud proscribed by the Act, but

also the "knowing, concealment, suppression or omission of any material fact with intent that

others rely upon such concealment, suppression, or omission."  N.J.S.A. 56:8-2.  Although

Wallace had no direct connection with Curriden, he was the primary actor in the deception and

fraud.  As well, he utilized Hurdle and Adams to act on his behalf in communicating with

Curriden to accomplish the transaction.  The scheme carried out by Wallace, Adams and Hurdle

constituted an unconscionable commercial practice, deception and fraud within the meaning of

the Consumer Fraud Act.

        The deceit, fraud and concealment occurring in the course of the Curriden transaction was

committed "in connection with the sale or advertisement of any merchandise or real estate."

N.J.S.A. 56:8-2.  In Channel Companies, Inc. v. Britton, 167 N.J. Super. 417, 418, 400 A.2d 1221

(App. Div. 1979), the New Jersey Appellate Division determined that a victimized seller cannot

impose liability under the Consumer Fraud Act upon a consumer for fraudulent conduct in
connection with a purchase.  The plaintiffs herein, Curriden and Curriden's bankruptcy estate, are
clearly the "sellers" in this transaction, and are seeking to utilize the Act.  Nonetheless, while the
role of the federal bankruptcy court in this context is to interpret state statutes as the state courts
would interpret them, see Roma v. U.S., 344 F.3d 352, 361 (3d Cir. 2003) (the court must "predict
how the [N.J.] Supreme Court would rule on this question of New Jersey law"), subsequent
reflections by the New Jersey Supreme Court about the Act enable us to apply plain language
meaning to the phrase "in connection with the sale . . . of . . . real estate" to include sellers as
potentially protected parties, where appropriate.  See, e.g., Gennari v. Weickert Co. Realtors,
supra, 148 N.J. at 604 ("The history of the Act is one of constant expansion of consumer
protection. . . .  Throughout its history, the Act has protected consumers from deception and fraud,
even when committed in good faith.").

A violation of the Consumer Fraud Act mandates the imposition of treble damages, costs
and attorney fees against the violators.  N.J.S.A. 56:8-19 ("In any action under this section the
court shall . . . award threefold the damages sustained by any person in interest . . . [T]he court
shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.").

Hurdle contends that his liability to the plaintiffs should not be imposed as joint and
several responsibility with the other defendants, in an amount that is threefold the damages
incurred in connection with the transaction.  He submits that his liability is easily ascertainable
by the amount of proceeds from Curriden's house that he personally received.  Hurdle

encourages the court to apportion responsibility fairly among the defendants.

Generally speaking, New Jersey law does favor the distribution of compensatory loss among the responsible parties in proportion to their respective fault. <u>Verni ex rel. Burstein v. Harry M. Stevens, Inc.</u>, 387 N.J. Super. 160, 206, 903 A.2d 475, 502 (App. Div. 2006). "In that regard, the Comparative Negligence Act,  N.J.S.A. 2A:15-5.1 to -5.8, 'mandates the apportionment of fault where "the question of liability is in dispute.""" <u>Id.</u> at 206-07, 903 A.2d at 502 (quoting <u>Boryszewski v. Burke</u>, 380 N.J. Super. 361, 375, 882 A.2d 410 (App. Div. 2005), <u>certif. denied</u>, 186 N.J. 242, 892 A.2d 1288 (2006)).  The Act "was designed 'to replace the former pro rata liability of joint tortfeasors . . . with the obligation of each tortfeasor to pay damages in accordance with its own adjudicated percentage of fault.'" <u>Metuchen Sav. Bank v. Pierini</u>, 377 N.J. Super. 154, 164, 871 A.2d 759, 765 (App. Div. 2005) (quoting <u>Johnson v. Am. Homestead Mortgage Corp.</u>, 306 N.J. Super. 429, 436, 703 A.2d 984 (App.Div.1997)). "In apportioning liability, 'the factfinder should compare the fault of all parties whose negligence was a proximate cause of the plaintiff's injuries.'" <u>Id.</u> (quoting <u>Campione v. Soden</u>, 150 N.J. 163, 177, 695 A.2d 1364 (1997)).

In <u>Gennari</u>, the New Jersey Supreme Court applied the Comparative Negligence Act to a recovery under the Consumer Fraud Act.  The Court held that "the Comparative Negligence Act encompasses not only negligence, but also strict liability, <u>Suter v. San Angelo Foundry & Mach. Co.</u>, 81 N.J. 150, 164, 406 A.2d 140 (1979); intentional torts, <u>Blazovic v. Andrich</u>, 124 N.J. 90, 106-09, 590 A.2d 222 (1991); and wanton conduct, <u>McCann v. Lester</u>, 239 N.J. Super. 601,

-23-

609-10, 571 A.2d 1349 (App. Div.1990).  Thus, the Comparative Negligence Act extends beyond negligence to other kinds of fault.  Suter, supra, 81 N.J. at 162-63, 406 A.2d 140."  Gennari v. Weichert Co. Realtors, 148 N.J. 582, 608-09, 691 A.2d 350, 367 (1997).  The Court determined that the extent of compensation to the injured party "should depend not on the description of the action, but on the nature of the injury and the requested remedies."  Id. at 609, 691 A.2d at 367 (citing to Pickett v. Lloyd's, 131 N.J. 457, 470, 621 A.2d 445 (1993)).  The apportionment of liability among the "'parties causing an injury should be . . . in proportion to their relative fault.'"  Id. (quoting Blazovic, 124 N.J. at 110, 590 A.2d 222).

Because the parties were not afforded an opportunity to fully explore the issues of joint and several liability among the defendants, and the impact of the Comparative Negligence Act on any apportionment of liability among the defendants, I will accept supplemental submissions by the parties on these questions.  In this regard, I note that the relative fault of each of the defendants is not necessarily tied directly to their personal gain from the sale proceeds.  I note further that "[b]ecause punitive damages are designed to punish the wrongdoer, and not to compensate the injured party, they can neither be apportioned nor subject to contribution among joint tortfeasors."  Blazovic v. Andrich, 124 N.J. 90, 108, 590 A.2d 222, 232 (1991).

d.    RESPA.

In the alternative, the defendants Wallace, Adams and Hurdle are also charged with violating the Real Estate Settlement Procedures Act, or RESPA, 12 U.S.C. §§ 2601 to 2617.

-24-

RESPA was enacted in part to eliminate the abusive practice of "the payment of referral fees,

kickbacks, and other unearned fees.  S.Rep. No. 93-866 (1974), reprinted in 1974 U.S.C.C.A.N.

6546, 6551.  Of particular interest to Congress was the payment by settlement service providers

of commissions or fees in exchange for the referral of a consumer's business. Id."  Sosa v. Chase

Manhattan Mortg. Corp., 348 F.3d 979, 981 (11th Cir. 2003).

> Congress enacted RESPA with the goal of "protect[ing] the American
> home-buying public from unreasonably and unnecessarily inflated prices in the
> home purchasing process."  See 64 Fed.Reg. 10081-82 (March 1, 1999); see also
> 12 U.S.C. § 2601(a).  In addressing real estate settlement procedures, Congress
> sought to, among other things, "effect certain changes in the settlement process
> for residential real estate that will result (1) in more effective advance disclosure
> to home buyers and sellers of settlement costs; (2) in the elimination of kickbacks
> or referral fees that tend to increase unnecessarily the costs of certain settlement
> services ...." 12 U.S.C. § 2601(b); see also 64 Fed.Reg. 10082.

Culpepper v. Irwin Mortg. Corp., --- F.3d ----, 2007 WL 1879710, *15 n.3 (11th Cir. July 2,

2007).  See also Boulware v. Crossland Mortg. Corp., 291 F.3d 261, 267 (4th Cir. 2002).

Section 2607 of RESPA provides:

> (a) Business referrals
>
> No person shall give and no person shall accept any fee, kickback, or thing of
> value pursuant to any agreement or understanding, oral or otherwise, that business
> incident to or a part of a real estate settlement service involving a federally related
> mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a).  Payment for services actually performed is permitted.  12 U.S.C. §

2607(c)(2).  A private cause of action for a violation of this section is authorized, and the

prevailing party may collect costs and reasonable attorneys fees.  12 U.S.C. § 2607(d)(5).  Any

-25-

person who violates the proscriptions specified "shall be jointly and severally liable to the person

or persons charged for the settlement service involved in the violation in an amount equal to

three times the amount of any charge paid for such settlement service."  12 U.S.C. § 2607(d)(3).


Here, Adams and Hurdle are liable to the plaintiffs for the "finder's fees" or "kickbacks"

they each received at settlement.  They "accepted" such fees in connection with bringing the

Curriden transaction to Wallace, who rendered "a real estate settlement service involving a

federally related mortgage loan" in connection with the Curriden transaction by obtaining a

mortgage loan for the Richardsons.  The mortgage loan constituted a "federally related mortgage

loan" within the applicable statutory definition.  12 U.S.C. § 2602(1)(B)(iv).[24]  Correspondingly,

Wallace is liable to the plaintiffs for "giving" kickbacks to Adams and Hurdle for the referral of

business in connection with the Richardson mortgage.  In exchange for the referral of the

Curriden transaction to him, Wallace agreed to pay Adams and Hurdle a finder's fee of $5,000

each.  This is exactly the type of transaction proscribed by section 2607(a).


Hurdle contends that he performed actual clerical services in preparation for the

settlement, and should be compensated accordingly.  In fact, the record reflects that Hurdle did

perform some clerical tasks, particularly in coordinating the details of the settlement with Trinity

Title, and conveying the necessary paperwork to the title company in anticipation of the closing.

However, Hurdle was not an official employee of Innovative Mortgage at the time, and was not

---

[24]      The Chapter 7 Trustee, Steven Neuner, Esq., established that the mortgagee who
funded the Richardson loan, Option One, "makes or invests in residential real estate loans
aggregating more than $1,000,000 per year." 12 U.S.C. §2602(1)(B)(iv).

authorized to be paid for his clerical services by anyone.  There is no doubt that he expected to be

paid for his services.  However, the monies he received do not reflect compensation for clerical

services rendered.  Rather, the payment fits squarely into the Congressional concept of a

"finder's fee" proscribed by the statute.

Under RESPA, defendants Adams, Hurdle and Wallace would be jointly and severally

liable to the plaintiffs for three times the amounts received by Adams and Hurdle, plus costs and

attorney fees.  Because the liability of these defendants under RESPA overlaps with their liability

under the New Jersey Consumer Fraud Act, only the latter will be reduced to judgment in favor

of the plaintiffs.

      2.     <u>Innovative Mortgage Solutions LLC</u>.

Defendant Innovative Mortgage Solutions LLC, a mortgage broker and mortgage banker,

is charged with vicarious liability for the wrongful acts of its employee, Alim Wallace, and his

subagent, Bruce Hurdle, in connection with the Curriden/Richardson transaction, and with

violations of the New Jersey Consumer Fraud Act.  We will first review the factual

circumstances pertaining to Innovative Mortgage, and we will then review applicable agency

principles and the Consumer Fraud Act to determine the merits of the plaintiffs' causes against

this defendant.

      a.     <u>Facts</u>.

-27-

Innovative Mortgage began its operations during the fall of 2004.  The main office was located in Audubon, New Jersey.  Brooke Hurdle supervised the Audubon office, and hired 4 or 5 mortgage solicitors during the fall of 2004, with the approval of the company's Managing Member, William Rogers.  Among the mortgage solicitors hired was Alim Wallace.  During the fall of 2004, Innovative had no approved branch offices.  It appears, however, that Wallace operated primarily out of an office in Cherry Hill, New Jersey.[25]  The Cherry Hill location became an approved branch office of Innovative in 2005, along with 13 other new branch offices. With the approval of William Rogers, Wallace hired his father-in-law, Harry Green, as a mortgage solicitor sometime in 2005.  In June 2005, Wallace hired Bruce Hurdle, Brooke Hurdle's brother, as a mortgage solicitor in the office.

Reflecting upon the Curriden/Richardson transaction, Rogers testified that he was aware that some of the Innovative Mortgage solicitors would purchase lists of foreclosures and pursue people in financial distress to determine whether a refinance was appropriate.  Although he testified that he saw no problem with an Innovative Mortgage employee finding a willing buyer for a distressed property, and achieving financing for the buyer, he acknowledged that mortgage solicitors such as Wallace were not licensed real estate agents or brokers, and were not authorized to act as such.  He testified that while mortgage solicitors could operate outside of the home office, at any location, only licensed, registered locations could be utilized for taking

---

[25]       The record suggests that prior to his employment by Innovative Mortgage, Wallace operated at the Cherry Hill location under the name of "Peoples Mortgage Company". Following his employment with Innovative Mortgage, Wallace maintained the same telephone and facsimile numbers he used under the name of Peoples Mortgage.

mortgage applications.  Rogers believed that Wallace was generally conducting business through

the Audubon office, but acknowledged that he was personally at the Audubon office only

sporadically, for about an hour a day, and did not directly supervise Wallace's daily whereabouts.

In contrast, Cynthia Richardson testified convincingly that she regularly saw Wallace at the

Cherry Hill location, and conducted her business with Innovative Mortgage through Wallace at

that location.

Although Bruce Hurdle was not hired by Innovative formally until June 2005, he was

active in assisting Wallace with the paperwork connected to the Curriden/Richardson transaction.

A series of facsimile transmissions between December 28, 2004 and December 30, 2004

concerning the Curriden closing was exchanged between Innovative Mortgage and Trinity Title.

The Innovative Mortgage representative on the faxes was noted as either Bruce Hurdle or

Wallace.  The telephone number and the facsimile transmission number on the cover sheets sent

from Innovative[26] remained the same when the location later became an official Innovative

branch office in 2005.

       b.     Applicable Agency Principles.

As a formal employee of Innovative Mortgage in the fall of 2004, Wallace was an agent

of the mortgage company.  See, e.g., Sears Mortgage Corporation v. Rose, 134 N.J. 326, 337,

---

[26]     Rogers testified that the letterhead used on the faxes between Innovative
Mortgage and Trinity Title was different from the formal letterhead customarily used by
Innovative Mortgage.

634 A.2d 74, 790 (1993) ("[a]n agency relationship is created when one party consents to have

another act on its behalf, with the principal controlling and directing the acts of the agent.").  The

circumstances presented here support two alternate bases to impose vicarious liability on

Innovative Mortgage as Wallace's employer:  first, that Wallace acted within the scope of his

agency relationship with Innovative Solutions, even though his specific conduct was not

authorized, and second, that even if Wallace acted outside the scope of his employment, "he was

aided in accomplishing the tort by the existence of the agency relationship."  Restatement

(Second) of Agency § 219(2)(d).[27]  See Lehmann v. Toys R Us, Inc., 132 N.J. 587, 619-20, 626

A.2d 445, 461-62 (1993) (adopting § 219); Entrot v. BASF Corp., 359 N.J. Super. 162, 193, 819

A.2d 447, 466 (App. Div. 2003).


(1)     Acting Within the Scope of Employment.


The plaintiffs contend first that Wallace's fraudulent acts were committed within the

scope of his employment with Innovative Mortgage, even though his specific conduct regarding

the Curriden transaction was not authorized by Innovative Mortgage.  If so, Innovative Mortgage

would be liable for the damages caused by Wallace's actions on the ground that "[a] master is

subject to liability for the torts of his servants committed while acting in the scope of their

employment."  Restatement (Second) of Agency, § 219(1).  See, e.g., Payton v. New Jersey

Turnpike Auth., 292 N.J. Super. 36, 44, 678 A.2d 279, 283 (App. Div. 1996) (applying

---

[27]     The Restatement (Second) of Agency was superseded by the Restatement (Third)
of Agency in 2005.  To date, New Jersey courts have consistently relied on Restatement (Second)
principles.

Lehmann); Abbamont v. Piscataway Tp. Bd. of Educ., 269 N.J. Super. 11, 26-27, 634 A.2d 538,

546 (App. Div. 1993) (defining scope of employment).  This principle is premised upon:

> the fiction that "the act of the servant is the act of the master" [which] has made it
> seem fair to subject the non-faulty employer to liability for the negligent and other
> faulty conduct of his servants. . . . [W]ith the growth of large enterprises, it
> became increasingly apparent that it would be unjust to permit an employer to
> gain from the intelligent cooperation of others without being responsible for the
> mistakes, the errors of judgment and the frailties of those working under his
> direction and for his benefit.

Restatement (Second) of Agency, § 219(1), Comment at 483.


The principle that an agent acting within the scope of his employment, but in a manner

that is not authorized by his employer, can cause liability to be imposed on his employer act was

applied in Lawyers Title Ins. Corp. v. Phillips Title Agency, 361 F.Supp.2d 443 (D.N.J. 2005).

Lawyers Title, a title insurance company, brought an action against Central Title, another title

insurance company, to recover damages incurred when agents of Central Title, including Phillips

Title and its principal Jay Phillips, schemed to induce a lender to provide a mortgage for a

fabricated real estate sale.  Central Title defended the law suit on the ground that it was not liable

for the acts of its agents which were committed outside the scope of their authority.  Judge Irenas

determined that Philips Title actually acted within the scope of its authority, but in a negligent

and fraudulent manner.  The court stated:

> Central Title is correct that principals are not liable for the acts of agents outside
> the scope of their authority.  Central Title certainly would not be liable for any
> losses caused by Phillips Title [which is in the business of issuing title insurance]
> in issuing homeowner's or automobile insurance.  The issue in this case, however,
> is Central Title's liability for losses due to the negligent and fraudulent manner in

> which Phillips Title closed the transaction.  Closing a transaction is squarely
> within the scope of Phillips Title's authority as a subagent of Central Title.  The
> common law is filled with instances where a principal is liable for harms arising
> from its agent's failure to conduct matters within the agent's authority in the
> manner prescribed by the principal.

Id. at 449-50 (Citation omitted).

Similarly, in New Century Financial Services, Inc., v. Dennegar, 394 N.J. Super. 595, 928

A.2d 48 (App. Div. 2007), a credit card holder authorized his housemate to utilize his credit card.

The debtor defended the attempted collection of the credit card debt by contending that some

purchases made by his housemate were not authorized by him.  The court rejected the argument,

reflecting that even if the housemate abused the authority given to him by the cardholder, the

cardholder is liable for the debt.

> The general rule is that a principal is accountable for the conduct of his agent
> acting within the scope of his authority even though the conduct is unauthorized
> and the principal receives no benefit from it, e.g., Mick v. Corp. of Royal
> Exchange Assur., 87 N.J.L. 607, 613-615, 91 A. 102 (E. & A. 1914).  The reason
> for the rule is that though the agent may have deceived the principal as well as the
> victim, since the principal placed the agent in the position where he had the power
> to perpetuate the wrong, the principal rather than the innocent third party should
> bear the loss.

Id. at 602, 928 A.2d at 52 (quoting Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329, 338,

173 A.2d 258, 263 (1961)).

An employee is acting within the scope of his employment if the action is "'of the kind

[that the servant] is employed to perform; it occurs substantially within the authorized time and

space limits; [and] it is actuated, at least in part, by a purpose to serve the master.'" DiCosala v.

<u>Kay</u>, 91 N.J. 159, 169, 450 A.2d 508, 513 (1982) (quoting Restatement (Second) of Agency §

228 (1957)).  <u>See</u> <u>also</u> <u>Abbamont v. Piscataway Tp. Board of Ed.</u>, 138 N.J. 405, 416, 650 A.2d

958, 963 (1994).

      Here, Wallace was hired by Innovative Mortgage to attract and solicit customers who

were interested in applying for mortgage loans.  His employment required him to assist potential

borrowers in applying for residential mortgages.  That is precisely what Wallace did when he

solicited the Richardsons to apply for a mortgage to purchase Curriden's property.  Rogers

confirmed that the active involvement of a mortgage solicitor in bringing a buyer and seller

together can be within the appropriate ambit of activity of a mortgage solicitor employed by

Innovative Mortgage.  The Innovative Mortgage Application Disclosure executed by Richardson

listed the services to be provided by Innovative Mortgage, including the collection and

transmission to the mortgage lender of the applicant's financial information, appraisals, credit

information and completed application.[28]

      Wallace completed and signed a "Uniform Residential Loan Application"[29] on behalf of

the Richardsons.  The loan application, signed by Wallace as the  "Interviewer", with Innovative

Mortgage Solutions noted as the "Interviewer's Employer", reflected that the purchase price of

the transaction was $125,000, that the loan amount was the same, and that the borrower (Vincent

Richardson) would be paying $315.75 at closing.  The application process, as well as the activity

---

[28]    Exh. P-1.

[29]    Exh. P-2.

conducted in preparation for the closing on the sale of the property, were all activities of the kind

that Wallace was employed by Innovative Mortgage to perform.[30]  Wallace performed the

services at least in part to achieve commissions and fees for his new employer, Innovative

Mortgage, which he did.

        As to whether the services were performed within authorized space limits, Innovative

Mortgage contends that the fact that Wallace transacted business away from Innovative

Mortgage's licensed office in Audubon insulates the company from liability.  In this context, the

argument is that because Wallace performed the loan services in an unauthorized space, he was

performing the services outside the scope of his employment.  That argument must fail.

        The record supports the conclusion that Innovative Mortgage authorized Wallace to

transact company business at the Cherry Hill location, and that Wallace was acting in the scope

of his employment with Innovative Mortgage in transacting the mortgage loan for and

distribution to the Richardsons.  Cynthia Richardson testified that she conducted all her business

with Wallace and Innovative Mortgage in Cherry Hill.  In November and December 2004, she

was involved not only in this transaction but also applied for and received a mortgage loan

through Wallace and Innovative Mortgage to purchase her mother's home.  She received,

delivered and signed all documents from Wallace at the Cherry Hill office.  The Cherry Hill

office was designated as an Innovative Mortgage office in the letterhead used to communicate

---

        [30]        Wallace delegated some of the preparation for the closing to Bruce Hurdle, but
that delegation does not alter the nature of the services rendered by Wallace to apply for the
Richardson loan and to prepare for the settlement.

with Trinity Title to set up the Curriden closing.[31]  The Cherry Hill office became a licensed

branch office of Innovative Mortgage in 2005.  Rogers, who worked mainly from his home in

late 2004, could not effectively dispute the fact that Wallace operated primarily out of his Cherry

Hill location on behalf of Innovative Mortgage.


While procuring a borrower and assisting in the process of applying for a mortgage loan

were within Wallace's scope of employment, the manner in which he carried out that task was

fraudulent.  He did not disclose to Option One, the potential mortgagee, that the borrower would

receive in excess of $26,000 at closing.  Nor did he reveal that he had arranged to pay illegal

kickbacks to Adams and Hurdle from the seller's proceeds.  The manner in which Wallace

performed his duties was fraudulent, but the process of assisting in the loan application process

and arranging for the closing was squarely within the scope of Wallace's authority as an

employee of Innovative Mortgage.


Like the circumstances described in Lawyers Title and New Century Financial Services,

Innovative Mortgage is accountable for the conduct of its agent acting within the scope of his

authority even though the conduct was unauthorized.  The principal did receive some benefit

from the transaction, particularly, the commissions and fees derived from the placement of the

Richardson loan.  By his scheme to defraud Curriden, Wallace no doubt deceived Innovative

Solutions as well as Curriden.  Nevertheless, Innovative Mortgage placed Wallace in the position

---

[31]     The fact that the letterhead used may not have been the formal letterhead used by
Innovative Mortgage does not alter the fact that Innovative Mortgage business was being
conducted at the Cherry Hill location.

where he had the power to perpetrate the wrong.  Mortgage solicitors are placed by their

mortgage broker employers in a position that enables them to prey on financially distressed

homeowners, to the substantial detriment of such homeowners.  The act of the servant, Wallace,

is the act of the master, Innovative Mortgage, which must therefore bear the loss.


(2)     Acting Outside the Scope of Employment.


Alternatively, it may reasonably be argued that by orchestrating the scheme of kickbacks

and returns to the buyer, Wallace acted outside the scope of his employment with Innovative

Mortgage.  Even if we so conclude, Innovative Mortgage remains liable to Curriden and

Curriden's bankruptcy estate under the principle articulated in Restatement (Second) of Agency §

219(2)(d), as follows:

>    (2) A master is not subject to liability for the torts of his servants acting outside
>    the scope of their employment, unless:  . . .
>
>    (d)  the servant purported to act or to speak on behalf of the principal and there
>    was reliance upon apparent authority, or he was aided in accomplishing the tort by
>    the existence of the agency relation.

Two New Jersey Supreme Court cases have relied on Section 219(2)(d) of the

Restatement (Second) of Agency to support the imposition of vicarious liability upon an

employer even where the servant acted outside the course of his employment.  In Hardwicke v.

American Boychoir School, 188 N.J. 69, 100-102, 902 A.2d 900, 919-20 (2006), a former

student at a private boarding school sued the school, asserting, among other things, that the

school was vicariously liable for the alleged sexual abuse he had endured from a faculty member

-36-

of the school while he was a student.  In <u>Hardwicke</u>, the Supreme Court determined that liability

could be imposed upon the school, even where the employee's conduct was outside the scope of

his employment, and the agent's conduct was intentional.  In <u>Lehmann v. Toys 'R' Us, Inc.</u>, 132

N.J. 587, 626 A.2d 445 (1993), the Court determinated that vicarious liability may be imposed

upon an employer under Section 219(d) in a sexual harassment case, where the supervisor

committed sexual harassment against an employee, and was aided in the commission of the

harassment by the nature of his position with his employer.

It is readily acknowledged that in both of these cases, while the court relied in part on

<u>Restatement (Second) of Agency</u> § 219(2)(d) to support the imposition of vicarious liability on

the respective employer, the holdings and underlying rationale articulated by the Court in each

case were narrowly drawn and can be distinguished from the circumstances presented here.  In

<u>Hardwicke</u>, the Court expressed a need to protect vulnerable child victims from child abuse, and

to impose vicarious liability on the employer institution because the institution is "in the best

position to know of the abuse and stop it."  <u>Hardwicke</u>, 188 N.J. at 102, 902 A.2d at 920.  Here,

the protection of financially distressed homeowners from overreaching mortgage solicitors may

not be as "compelling" as the protection of children from sexual victimization.  In <u>Lehmann</u>, §

219(2)(d) was applied in the context of the delegation of power by the employer to the supervisor

to control the daily working environment.  The supervisor would then be aided in the

commission of sexual harassment toward employees in the workplace by reason of the powers

delegated to him.  Here, Innovative Mortgage did not specifically delegate particular powers that

aided Wallace in the commission of the fraud described herein.

Nevertheless, the Restatement (Second) of Agency Comment to § 219(2)(d) supports the conclusion that an employer may be subjected to liability for acts of his employees outside the scope of the servant's employment simply because the position of the employee as agent of the employer enables the employee to commit wrongful acts. The Comment reflects that: "[A] master may be liable for torts of servants acting solely for their own purposes and hence not in the scope of employment." Id. at 484. As to subsection (d), which recognizes the opportunity to impose liability on the employer where the employee is "aided in accomplishing the tort by the existence of the tort relationship", the Comment notes that:

> the servant may be able to cause harm because of his position as agent, as where a telegraph operator sends false messages purporting to come from third persons. See § 261. Again, the manager of the store operated by him for an undisclosed principal is enabled to cheat the customers because of his position. See § 222. The enumeration of such situations is not exhaustive, and is intended only to indicate the area within which a master may be subjected to liability for acts of his servants not in scope of employment.

Id. at 485. A further articulation of this principle is found in § 261, which provides:

> A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.

Restatement (Second) of Agency § 261. The Comment to § 261 confirms that the principal may be subject to liability even if he is entirely innocent, has received no benefit from the transaction and the agent acted solely for his own purposes. Id.

Here, by reason of his position as an employee of Innovative Mortgage, Wallace was able to perpetrate a fraud on Curriden by arranging for the sale of her home, obtaining a mortgage

loan for the Richardsons, and arranging for substantial kickbacks and payments to the parties

involved.  Even if Wallace's activities were conducted outside the course of his employment, his

position with Innovative Mortgage allowed him to accomplish the wrongdoing.  The plaintiffs

correctly contend that Innovative Mortgage was "in the best position to know of the abuse and

stop it", and "to implement corrective measures, and to adopt and enforce employment policies

that will serve to achieve the salutory purposes of the respective legislative mandates."

Hardwicke, 188 N.J. at 102, 902 A.2d at 920.  Therefore, Innovative Mortgage is vicariously

liable to the plaintiffs for the damages incurred.


        c.      New Jersey Consumer Fraud Act.


        The plaintiffs have charged Innovative Mortgage with violating the New Jersey

Consumer Fraud Act, and seek to impose liability for treble damages against the company.

Because the liability of Innovative Mortgage is based on agency principles of vicarious liability

rather than direct involvement by upper management of the company in deception, fraud or other

unlawful practices under the Act, Innovative Mortgage did not violate the Act, and is not liable

for treble damages under the Act.


        In Lehmann v. Toys "R" Us, supra, the Supreme Court determined that an employer may

be liable for compensatory damages under a vicarious liability theory, but may not be liable for

punitive damages except "in the event of actual participation by upper management or willful

indifference."  Lehmann, supra, 132 N.J. at 625, 626 A.2d at 464.  The court remarked that

-39-

punitive damages are awarded only "when the wrongdoer's conduct is especially egregious." Id.

at 624, 626 A.2d at 464.  The employer in the Lehmann sexual harassment case was not charged

with direct liability for wrongful actions committed by the employer, but rather with vicarious

liability based on the conduct of its agent.  There was no participation in the wrongdoing by the

employer's upper management, and therefore no basis to impose punitive damages upon the

company.

A similar rationale applies to preclude a finding of liability under the New Jersey

Consumer Fraud Act against Innovative Mortgage.  The award of treble damages under the

Consumer Fraud Act has been characterized by a New Jersey bankruptcy court as punitive in

nature.  In re Cohen, 185 B.R. 180, 188 (Bankr. D.N.J. 1995), aff'd, 191 B.R. 599 (D.N.J. 1996),

aff'd, 106 F.3d 52 (3d Cir. 1997), aff'd, 523 U.S. 213, 118 S. Ct. 1212, 140 L.Ed.2d 341 (1998).

On appeal, the Court of Appeals accepted the bankruptcy court's characterization without

deciding the question, 106 F.3d at 55, n.2, and the Supreme Court did not disturb the

characterization, noting that the "issue does not affect our analysis."  523 U.S. at 216 n.1, 118 S.

Ct. at 1215 n.1.  Even without definitive appellate review of the nature of the penalty, it is

plausible to conclude that the mandatory consequence of treble damages for committing an

unlawful practice under the Act is aimed at punishing and deterring commercial actors who

victimize consumers by their practices.

In other cases in which liability has been imposed under the Consumer Fraud Act upon

both employees and employers, the employer and its upper management have been directly

-40-

implicated in the wrongdoing.  In <u>Gennari v. Weichert Co. Realtors</u>, <u>supra</u>, purchasers of homes

in a real estate development brought an action alleging, among other things, Consumer Fraud Act

violations against Weichert Realtors, the real estate brokerage firm which marketed the

development, as well as the builder, the builder's wife, and the corporation owned by the builder

and his wife.  The builder's wife was a broker with Weichert.  Weichert was determined to be

liable under the Consumer Fraud Act because its agents affirmatively misrepresented the

experience and workmanship of the builder whose homes it marketed, advertised and sold.

About Weichert's involvement, the trial court noted that:

> high Weichert management made a determination to spend considerable funds
> that would boldly display its name in the signage at the construction site, in
> advertising, in brochures, and in the presence of its sales agents.  Weichert was
> proclaiming the excellence of the project.

148 N.J. at 591, 691 A.2d at 354.  Weichert's representations led purchasers to believe that

Weichert agents were familiar with the builder and his workmanship, and that the builder was an

exacting and demanding builder of real substance.  These representations misled the purchasers,

and Weichert was charged not only vicariously by reason of the conduct of its agents, but also

directly, for Consumer Fraud Act violations.


Similarly, in <u>Strawn v. Canuso</u>, 140 N.J. 43, 657 A.2d 420 (1995), home purchasers

brought a class action against home builders and home-selling brokers, alleging, among other

things, violations of the Consumer Fraud Act arising from failure to disclose the existence of a

nearby closed landfill.  The New Jersey Supreme Court determined that liability may be imposed

on the developers and real estate brokers, where decisions about nondisclosure of known

-41-

environmental hazards in the area of the properties to be sold were made by high levels of management, who appeared to be willfully indifferent to the information known about hazardous waste in the area.

The types of situations described in the Gennari and Strawn cases differ markedly from the circumstances described here.  Even if it is concluded that Wallace acted in the course of his employment with Innovative Mortgage in defrauding the debtor, the liability of Innovative Mortgage is vicarious, based on its status as the instrumentality utilized by Wallace to accomplish his wrongdoing.  No direct liability may be imposed under the Consumer Fraud Act upon Innovative Mortgage in this context.

For these reasons, I conclude that Innovative Mortgage is not liable to the plaintiffs for treble damages under the Consumer Fraud Act, but is liable to the plaintiffs for compensatory damages under agency principles.  As with the issue of the extent of Hurdle's liability to the plaintiffs, the issue of the extent of the liability of Innovative Mortgage to the plaintiffs remains to be determined.  Submissions on the issues of the joint and several liability of Innovative Mortgage with the other defendants, and the impact of the Comparative Negligence Act, are solicited.

3.    Trinity Title and Danette Thomas.

As noted above, the closing on the Curriden property occurred at Trinity Title and was

-42-

conducted by Danette Thomas, the closing agent and part owner of the title insurance company.

Although the complaint alleges that Trinity Title and Thomas committed fraud, conspiracy, and

Consumer Fraud Act violations in connection with the Curriden transaction, no such fraud or

deceptive practices were established at trial against these defendants.  It is acknowledged that

Thomas' memory of the closing was faulty, and that there were discrepancies between her

testimony at her deposition and at trial.  It is also understood that Thomas was acquainted with

the defendants (with the possible exception of Jeffrey Adams).  Nevertheless, no proofs were

submitted that would impose upon Thomas liability for conspiratorial participation in the scheme

to defraud Curriden of the equity in her home, or an intent to deceive Curriden, or for engaging in

an unconsciousable commercial practice.  Remaining to be resolved is whether the actions of

Thomas and Trinity Title constituted aiding and abetting the scheme orchestrated by Wallace and

the other defendants to deprive Curriden of the equity in her home, and to cause her ascertainable

loss, and/or whether the actions and omissions of these defendants constituted actionable

negligence in carrying out their duties as closing agent on the Curriden transaction.

The problem with reaching the issue of whether these defendants should be charged with

liability on these grounds is that these causes of action have not been properly pled.  Two days

before the trial of this matter, the plaintiffs filed a trial brief in which they sought to amend the

original complaint to charge Trinity Title, Danette Thomas and others with aiding and abetting

the other defendants in the case.  No proposed amended pleading was filed.  Nor was the issue of

the amendment of the complaint otherwise raised by the plaintiffs during or after trial.

Under Fed.R.Bankr.P. 7015, which refers to Fed.R.Civ.P. 15(b), an amendment of the pleadings to conform to the evidence may be accomplished at any time upon motion of any party. In pertinent part, the rule provides:

> (b)   Amendments to Confirm to the Evidence.  When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.  Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

Fed.R.Civ.P. 15(b).  Rule 15 thus allows amendment when the issues were "tried by express or implied consent of the parties."  "In order to ascertain whether they gave implied consent, we look to 'whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond.'" Foraker v. Chaffinch, No. 06-4086, 2007 WL 2445561, *12 (3d Cir. Aug. 30, 2007) (quoting Douglas v. Owens, 50 F.3d 1226, 1236 (3d Cir. 1995)).  See also Bernback v. Greco, 69 Fed.Appx. 98, 102 (3d Cir. 2003); Ajax Enterprises v. Fay, No. 04-4539, 2007 WL 576449, *5 (D.N.J. Feb. 21, 2007) ("Rule 15(b) mandates liberal amendments to conform pleadings to the evidence.").

Here, the plaintiffs will be required to move to amend the pleadings to reflect the causes of action against Trinity Title and Danette Thomas which the plaintiffs believe have been tried. Of course, the defendants Trinity Title and Thomas may defend against the motion.  If the

-44-

plaintiffs are successful in amending the pleadings, a final decision on the liability of Trinity Title and Thomas in this action will be entered.


    4.    <u>Cynthia and Vincent Richardson</u>.


Cynthia Richardson testified that at a party during the summer of 2003, she met Brooke Hurdle, defendant Bruce Hurdle's brother, and talked to Brooke and to Wallace, a long-time family friend, about taking a course to become a loan officer.  Wallace was studying at the time to become a mortgage solicitor.  Cynthia worked as a credit manager and collections agent for approximately 20 years, with the responsibility to maintain receivables, evaluate the credit worthiness of potential business customers and to collect business debt.  Following the discussion with Brooke Hurdle, she attended one class, covering such topics as personal credit and loan origination.  In April 2004, Wallace assisted Vincent Richardson in refinancing Vincent's Philadelphia property.  In November 2004, Cynthia and Vincent purchased Cynthia's mother's home, and arranged financing again with Wallace through Innovative Mortgage, where he was then employed.  The sale price of the home was $175,000.  Wallace arranged for 100% financing.  Cynthia and her mother agreed in advance that Cynthia and Vincent would receive approximately $32,000 from the proceeds, which they planned to use to rehabilitate the property.  Cynthia testified that Wallace "talked me through all of it [the purchase of her mother's home and the mortgage application and approval process].  I never bought a house before.  My credit was really bad.  I never thought I would be a home owner."[32]

---

[32]    T257-14 through 16. (2/22/07).

Around the time that Wallace was arranging for the purchase by the Richardsons of their residence, he discussed with Cynthia the prospect of becoming a real estate investor. Wallace described "bridge deals", whereby an investor purchased property from a financially distressed seller, shared in the seller's net proceeds, and either leased the property back to the seller or resold the property for profit. Wallace subsequently presented the Curriden transaction to Cynthia, promising her that she could purchase the property with no out of pocket costs, and that she would receive $40,000 at the settlement table. Following a visit to the Curriden house, Cynthia and Vincent agreed to purchase the property.

Shortly before the closing, Cynthia learned that the $40,000 she and Vincent were expecting to receive at closing would be reduced by finder's fees payable to Adams and Hurdle. At the settlement table, she also realized that she would not be obtaining possession of the property on that date, because Curriden would not vacate the property immediately. In Thomas' office, with Wallace, Adams and Hurdle present, after heated, angry and loud debate among the parties, the decision was made to allow the debtor to remain in the property for a month, at a charge of $1,160. It was also determined that the rental charge would be deducted from the finder's fees to be achieved by Adams and Hurdle. The Richardsons agreed to receive the amount of $26,602.74, plus the rental payment of $1,160 for January. The rental payment was placed in escrow with Trinity Title. As described above, when the rental check was erroneously sent to Curriden in January, Cynthia made contact with Curriden to retrieve the check, as well as an additional $1,500 that had been escrowed in connection with the satisfaction of the Curriden mortgage. The Clayton property was later sold by the Richardsons in November 2005 for a net

profit of approximately $1,300.

The three-count complaint filed against the Richardsons in their Chapter 13 case seeks nondischargeability for the claim of the Curriden bankruptcy estate, through 11 U.S.C. §1328(a)(2),[33] pursuant to 11 U.S.C. §523(a)(2)(A) and (a)(4).  The latter section, section 523(a)(4), excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."  While the plaintiffs have alleged a breach by the Richardsons of a fiduciary duty to Curriden, no such fiduciary duty has been established on this record.  For purposes of section 523(a)(4), the fiduciary relationship must arise in conjunction with an express or a "technical" trust, i.e., a trust imposed by law.  In re Regan, 477 F.3d 1209, 1211 n.1 (10th Cir. 2007); In re Blaszak, 397 F.3d 386, 391 (6th Cir. 2005).  Because a key component of a  section 523(a)(4) nondischargeability cause is missing, the quest for a nondischargeability declaration on that basis must be rejected.

--------

[33]       Section 1328 provides in relevant part:

(a) Subject to subsection (d), as soon as practicable after completion by the debtor of all payments under the plan, and in the case of a debtor who is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, after such debtor certifies that all amounts payable under such order or such statute that are due on or before the date of the certification (including amounts due before the petition was filed, but only to the extent provided for by the plan) have been paid, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter, the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt--
        . . .
        (2) of the kind specified in section 507(a)(8)(C) or in paragraph (1)(B), (1)(C), (2), (3), (4), (5), (8), or (9) of section 523(a).

11 U.S.C. § 1328.

We are left with a claim by the plaintiffs that the debt due to Curriden and the Curriden bankruptcy estate should be declared nondischargeable under section 523(a)(2)(A).  The plaintiffs claim that the Richardsons, by their fraudulent and deceptive actions, which included violations of the Consumer Fraud Act and RESPA, may not receive a discharge of their debt to the plaintiffs.  The threshold task here is not to determine whether Consumer Fraud Act or RESPA violations have occurred.  Rather, we must first determine whether a section 523(a)(2)(A) cause has been established on this record.

That section provides that:

(a)  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt
. . . .

(2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by

(A)  false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).  In order to satisfy section 523(a)(2), the plaintiff must prove its case by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 287-88, 111 S. Ct. 654, 659-60, 112 L. Ed.2d 755 (1991); In re Hilley, 124 Fed.Appx. 81, 82 (3d Cir. 2005); In re Barnaby, No. 05-33096, 2007 WL 750332, *1 (Bankr. D.N.J. Mar. 6, 2007); In re Casini, 307 B.R. 800, 815 (Bankr. D.N.J. 2004).  To establish nondischargeability under section 523(a)(2)(A), plaintiff must show that:

(1) the debtors made the misrepresentations;

(2) that at the time they knew they were false;

(3) that they made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations, and

(5) that the creditor sustained the alleged loss and damage as the proximate result
of the representations having been made.

In re Hashemi, 104 F.3d 1122 (9th Cir.), cert. denied, 520 U.S. 1230, 117 S. Ct. 1824, 137 L.

Ed.2d 1031 (1997).  See also In re Spigel, 260 F.3d 27, 32 (1st Cir. 2001); In re Harmon, 250

F.3d 1240, 1246 (9th Cir. 2001); In re Daley, No. 05-87138, 2007 WL 605019, *2 (Bankr.

C.D.Ill. Feb. 22, 2007); In re Christofaro, 360 B.R. 411, 414 (Bankr. W.D.N.Y. 2007).


I must conclude that the plaintiffs have failed to establish the section 523(a)(2)(A)

elements here.  The debtors made no representations to Curriden either prior to the closing, when

they visited the Curriden property and first met Curriden, or at the closing.  There is no showing

of reliance by Curriden upon any representation by the Richardsons.  Nor is there a requisite

showing of actual or positive intent to deceive Curriden.


The issue of intent requires actual or positive intent.  See Palmacci v. Umpierrez, 121

F.3d 781, 789 (1st Cir. 1997)(there must "be an actual finding of intent to deceive"); In re

Mayerson, 254 B.R. 407, 411 (Bankr. N.D. Ohio 2000); In re Young, 181 B.R. 555, 558 (Bankr.

E.D. Ok. 1995).  At the time of the representation, the defendants must have intended by their

representations to deceive the plaintiff.  In re White, 128 Fed. Appx. 954, 998-99 (4th Cir. 2005);

In re Rubin, 875 F.2d 755 (9th Cir. 1989). Since intent to defraud or deceive is rarely admitted,

the intent to deceive may be inferred from the surrounding facts and circumstances of the case.

In re White, 128 Fed. Appx. at 999, In re Atkinson, 14 Fed. Appx. 960, 962 (9th Cir. 2001); In re

Van Horne, 823 F.2d 1285, 1287 (8th Cir. 1987); In re Reynolds, 193 B.R. 195, 200 (D.N.J.

1996). In this context, a reckless disregard of the accuracy of the information has bearing on an

intent to deceive. See, e.g., In re Cohen, 191 B.R. 599, 605 (D.N.J. 1996), aff'd, 106 F.3d 52 (3d

Cir. 1997), aff'd, 523 U.S. 213, 118 S. Ct. 1212, 140 L.Ed.2d 341 (1998) ("proof of reckless

indifference to the truth will satisfy both the knowledge and intent to deceive prongs of §

523(a)(2)(A)"); In re Costanzo, No. 05-42920, 2006 WL 2460639, *4 (Bankr. D.N.J. Aug. 23,

2006) ("'Intent to deceive may be inferred from the totality of the circumstances, including a

reckless disregard for the truth.'"); In re Schroeder, No. 01-14748, 2006 WL 4452975, *13

(Bankr. D.N.J. Mar. 31, 2006).


Here, although Cynthia Richardson is an experienced credit manager, and is obviously

intelligent and articulate, she is unsophisticated in real estate transactions. She relied exclusively

on her life-long family friend, Wallace, to "talk her through" both the purchase of her mother's

house and the purchase of the Curriden property. While Cynthia displayed substantial greed in

connection with the transaction, expressing anger that she and Vincent would receive less from

the settlement than she had expected, I am convinced that the Richardsons did not understand the

transaction, or the fact that Wallace had master-minded a scheme to deceive the debtor and to

deprive the debtor of the equity in her home. The actual or positive intent to deceive Curriden by

the Richardsons, or even a reckless indifference to the nature of the transaction from which an

intent to deceive may be inferred, was not demonstrated.  The trustee's three-count complaint

against them must fail.

## **CONCLUSION**

In summary, I conclude the following:

1.      The defendants Adams and Hurdle have committed acts of common law fraud.

Adams, Hurdle and Wallace have engaged in a civil conspiracy, and have violated

the New Jersey Consumer Fraud Act and RESPA.

2.      The defendant Innovative Mortgage Solutions LLC is vicariously liable to the

plaintiffs.

3.      As to the defendants Trinity Title and Danette Thomas, the plaintiffs may move

within thirty (30) days of this opinion for leave to amend their complaint.

4.      To be determined is the apportionment of liability among the defendants.  The

parties will be afforded an opportunity to make submissions on the issues of

joint and several liability among the defendants, and the impact of the

Comparative Negligence Act, following the resolution of the liability of Trinity

Title and Danette Thomas to the plaintiffs.

5.      On the quest by the Chapter 7 trustee of the Curriden bankruptcy estate to

declare the debt due from the Richardsons nondischargeable, the quest is denied.

The debt may be discharged.


The plaintiffs are requested to submit a form of order for each adversary proceeding in

conformance with this opinion.



Dated:   September 6, 2007

JUDITH H. WIZMUR
CHIEF JUDGE
U.S. BANKRUPTCY COURT